**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

WARMING TRENDS, LLC f/k/a FLAHERTY HOLDINGS, LLC,
a Delaware limited liability company,

    Plaintiff

v.

ROCK ENTERPRISES, INC., a Colorado corporation f/d/b/a WARMING TRENDS;
MICHAEL S. WINDEMULLER; DIVO CATOZZO; and RAMON L. PIZARRO,

    Defendants

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Warming Trends, LLC, by and through its attorneys, Luke McFarland and Cyd Hunt of Evans & McFarland, LLC, for its Complaint against Rock Enterprises, Inc., Michael S. Windemuller, Divo Catozzo, and Ramon L. Pizarro (collectively, "Defendants"), states as follows:

## NATURE OF ACTION

1. This is an action against Defendants under the the United States Defend Trade Secrets Act and for claims of fraud, breach of contract, and negligent misrepresentation. Plaintiff purchased various business assets from Defendants Rock Enterprises, Windemuller, and Catozzo. In the context of this purchase, these Defendants directly and via their counsel and agent, Defendant Pizarro, made numerous representations, warranties, promises, and assurances as to the value of the assets. Shortly after the closing on the purchase, Plaintiff learned that various of these representations, warranties, promises, and assurances were incorrect, and that Defendants knew they were incorrect when they were made. This conduct has caused Plaintiff to

incur substantial damages, both in the differential between the represented value and the actual value of the assets purchased and in the time, effort, and expense necessary to remedy multiple problems directly caused by Defendants' misrepresentations.

## PARTIES

2. Plaintiff Warming Trends is a Delaware limited liability, duly authorized to do business in Colorado, with its principal place of business at 4731 South Santa Fe Circle, Suite 2, Englewood, Colorado 80110. Warming Trends is a leading manufacturer of burners and other fire feature accessories for outdoor and other fire pits. Warming Trends was formerly named Flaherty Holdings, LLC, including during the occurrence of many of the events giving rise to this action, but changed its name in April 2018 following acquisition of the Warming Trends business from Defendants, excluding Mr. Pizarro. Warming Trends' members are Tim and Voni Flaherty (collectively, "the Flahertys"), husband and wife, both of whom are residents of the state of Colorado.

3. Defendant Rock Enterprises, Inc. ("Rock"), is a Colorado corporation that formerly owned the assets comprising the business acquired from it by Plaintiff on or around April 2, 2018. Rock's registered address is 15932 Deer Ridge Drive, Morrison, Colorado 80465.

4. Defendant Divo Catozzo ("Catozzo") is a shareholder of Rock and was, at all times relevant to this action, its Chief Executive Officer. Catozzo resides at 15932 Deer Ridge Drive, Morrison, Colorado 80465.

5. Defendant Michael S. Windemuller ("Windemuller") is a shareholder of Rock and was, at all times relevant to this action, its Chief Operating Officer. Windemuller resides at 5409 Southwind Court, Morrison, Colorado 80465.

6. Defendant Ramon L. Pizarro ("Pizarro") is an attorney licensed to practice law in the State of Colorado, holding Registration Number 21400 and with a principal business address of 7535 East Hampden Avenue, Suite 501, Denver, Colorado 80231. Pizarro represented Rock, Catozzo, and Windemuller in connection with Plaintiff's acquisition of the Warming Trends business and in connection with certain patent and litigation matters relating to that transaction.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action under 28 U.S.C. § 1331, as Plaintiff asserts a claim arising under federal law, specifically, under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391, as all Defendants are residents of the State of Colorado and therefore reside within this District.

9. An actual case or controversy has arisen between the parties.

10. Plaintiff has been injured by Defendants' misconduct and has suffered significant damages resulting therefrom.

## FACTUAL BACKGROUND

**The Letter of Intent and Due Diligence**

11. In the late fall of 2017, the Flahertys (as Flaherty Holdings) began considering acquiring the business known as Warming Trends. In connection therewith, they engaged the necessary professionals and negotiated a letter of intent with Rock, Catozzo, and Windemuller (collectively, "Sellers") and their business broker, Mike Grande ("Broker") of SDR Ventures, Inc., an investment bank located in Denver. The resulting Letter of Intent ("LOI"), executed on or around December 13, 2017 is attached hereto as Exhibit 1.

3

12. In addition to the exclusivity mutually agreed upon by the parties and memorialized at Section 8 of the LOI, substantial and unfettered due diligence was a material element required by Flaherty Holdings and, accordingly, Section 5 of the LOI, entitled "Access to Information" was included therein and specifically provided that Flaherty Holdings would have full access to Rock's "assets, properties, books, records, financial statements, 'Intellectual Property' (including patents, trademarks, trade secrets, proprietary information and know-how, and further including, without limitation, all applications (e.g., provisional, full utility applications and any continuations, divisions and continuations-in-part)) and other information and documentation related to the Company, and to the Company's management employees as necessary to evaluate the Company (collectively, 'Evaluation Materials')" and that Sellers would also provide access to Rock's "attorneys, counsel and/or patent agents with respect to any Intellectual Property or litigation." *See* Exhibit 1 at 2, §5.

13. In connection with due diligence, the status of Rock's intellectual property and the status and exposures of the pending lawsuits in which the company was involved were of particular and primary interest. Accordingly, on or around December 20, 2017, Flaherty Holdings instructed its counsel and advisors to prioritize review of the Evaluation Materials concerning those topics prior to the negotiation and execution of a purchase agreement.

14. On December 21, 2017, Flaherty Holdings' counsel, Jamal M. Edwards ("Edwards") submitted two sets of Initial Due Diligence Requests to Sellers via the Broker, including (i) General Corporate and (ii) Focused IP and I[T], noting "as we understand the evaluation of Sellers' IP is a priority." *See* Exhibit 2, 12/21/2017 Edwards email to Grande re Due Diligence Requests.

15.     Pursuant to at least Section 5 of the LOI, Sellers designated Pizzaro as their exclusive agent for purposes of providing the requested Evaluation Materials concerning Rock's pending patent application and other intellectual property matters, as well as the three pending lawsuits in which Defendants were already involved.  To that end, on December 22, 2017 the Broker sent an email to Flaherty Holdings' counsel providing Pizarro's contact information and advising that "Divo [Catozzo] will call him today and let him know you will be contacting him." *See* Exhibit 3, 12/22-27/17 email exchange at 2 (attachments excluded).

16.     In fact, in response to several queries of Catozzo by Flaherty Holdings and its counsel, Catazzo repeatedly directed that all such requests be sent to, and any available information received from, Pizarro.  Accordingly, counsel for Flaherty Holdings directed specific intellectual property and other legal due diligence requests to Pizarro on or around December 27, 2017 by email, requesting a teleconference with Pizarro "on or around Jan[uary] 5 or January 8." *Id.* at 1.

17.     Several discussions ensued between Flaherty Holdings and Sellers regarding the due diligence requests, most often involving or through the Broker and including Catozzo.  In response to these discussions, documents were uploaded to a dropbox site by the Broker, Catozzo, and Pizarro.

18.     Following the upload of these initial materials, on January 11, 2018, the parties held a conference call, including, at least, the Flahertys, Sellers, and the Broker, during which Edwards noted some deficiencies in the materials produced.  In response, Catozzo sent an email suggesting he had a more narrow understanding of the outstanding issues.  Edwards replied to both Catozzo and Windemuller in an effort to clarify the scope of the requests and emphasize Flaherty Holdings' priorities, specifically including, "We are very interested in diligence re both

5

the pending patent application and the trade secret/NDA litigation, as we discussed this on the last IP Call. It is among our highest priorities. I previously sent Ramon the diligence requests. The IP requests (only) are re-attached for convenience. To be clear, we need everything that Seller has on the IP diligence requests, including the documents requests and not just the information responses and, as soon as possible. . . .We also need the docket sheets for each of the pending lawsuits and the material documents cited thereon." *See* Exhibit 4, 1/11/18 email exchange at 1 (attachments excluded).

19. Pizarro contacted Edwards on or around January 12, 2018 and left a voice mail message essentially stating that he believed he had uploaded all the responsive materials in his possession and asking Edwards to call him back if he needed anything else. Pizarro also followed up with an email to the same effect later that day, to which Edwards responded, noting some discrepancies in the materials provided. *See* Exhibit 5, 1/11-12/2018 email exchange between Edwards and Pizzaro at 1. Subsequently that same day, Edwards and Pizarro traded another set of voice messages, including one in which Edwards requested "complete case files including all discovery materials" for the pending lawsuits and the entire file wrapper for the patent application, as some of the materials were not initially provided as requested.

20. After receiving these documents, Edwards spoke with Pizarro via phone, during which calls Edwards repeatedly asked Pizarro if he had provided everything he had regarding these cases, including any discovery materials. Pizarro confirmed that he had provided all the pleadings and discovery materials.

21. On or around January 29, 2018, Pizarro also represented to Edwards that a letter he had written to a company called Fairview Fittings asserting claims of trade secret misappropriation and/or prospective patent infringement was most likely related to a burglary

6

that had occurred at the Sellers' offices several years prior and provided copies of a police report, suggesting that it should resolve counsel's concern.

22. Because the LOI provided for only 60 days of exclusivity, the Broker sent a draft extension of the LOI on or around February 1, 2001. Still lacking sufficient due diligence information, and because the LOI provided for an automatic renewal unless otherwise terminated, the Flahertys did not execute this draft extension. Thereafter, on February 15, 2018, counsel for the Sellers sent a notice terminating the LOI's automatic renewal as of February 21, 2019 and insisting the parties be under contract by February 20, 2019. Viewing this as a pressure tactic, the Flahertys still did not respond and instead continued to insist on complete responses to their due diligence requests, particularly regarding everything related to Sellers' intellectual property and the pending lawsuits, including complete case files and assurances from patent and litigation counsel that the cases had been properly brought and prosecuted, before executing a purchase agreement. As a result, and in order to induce the Flahertys' continued participation, Sellers issued a written notice rescinding their termination of the LOI on February 19, 2018. Immediately prior to this, the Flahertys insisted on, and Sellers agreed to, weekly status calls regarding due diligence; the calls ensued as requested, and the Flahertys continued to request and receive assurances they had been provided complete due diligence information regarding Sellers' intellectual property and the pending lawsuits.

23. Thereafter, additional documents were requested, and calls with Sellers and Pizarro were held in which the Flahertys requested assurances of the completeness of the due diligence information provided regarding Sellers' intellectual property and the pending lawsuits.

**The Asset Purchase Agreement and Acquisition**

24. After extensive negotiations and after repeatedly being assured by Catozzo and Pizarro that Sellers had provided all the Evaluation Materials and due diligence information the Flahertys had requested, the parties executed an Asset Purchase Agreement ("APA") on March 13, 2018, a redacted copy of which is attached as Exhibit 6.

25. The APA contains representations and warranties from the Sellers that all purchased intellectual property was "valid and enforceable," that all applications for intellectual property were properly filed and maintained in compliance with law, and that such property was not then under any legal threat or being infringed by third parties, except as otherwise disclosed to Flaherty Holdings. The Sellers further represented in the APA that Sellers had taken all reasonable steps to preserve the trade secrets being purchased by Flaherty Holdings. *See* Exhibit 6 at § 4.10(a) and (b). Sellers specifically represented that "there are no Legal proceedings pending or, to the Knowledge of the Seller, threatened against the Seller," except as otherwise disclosed. *Id.* at § 4.14.

26. Additionally, the APA requires the Sellers' continued cooperation and assistance in connection with the ongoing operation of the business following the closing and in connection with the prosecution of the pending lawsuits that were included among the purchased assets. For example, Sellers agreed to preserve all records relating to the business and make them available to Flaherty Holdings, including those records related to legal proceedings. *Id.* at § 6.7.

27. The APA also provides for Sellers' indemnification of Flaherty Holdings, including for the consequences of "any breach of any representation or warranty of any Seller Party." *Id.* at § 9.2(a).

8

28. Pursuant to the APA, Flaherty Holdings acquired all right, title, and interest to substantially all of Rock's assets, including, without limitation, its intellectual property, material contracts, and all claims arising under or relating to the same, including ongoing litigation (the "Acquired Lawsuits").

29. The transactions contemplated by the APA were consummated via a closing on or around April 2, 2018.

30. Immediately after closing, the name of Flaherty Holdings, LLC was changed to Warming Trends, LLC.

31. After closing on the APA, counsel for Plaintiff substituted into the Acquired Lawsuits. Shortly thereafter, it became apparent that several of the representations made by Sellers, including the express oral representations made by Pizarro and Catozzo, were untrue. Both gentlemen expressly represented that they had produced all the information and documents requested by the Flahertys, particularly as it related to intellectual property and the related lawsuits.

32. For example, while Pizarro represented before the closing that he had provided a complete case file, including all the documents in his possession regarding the Acquired Lawsuits, he sent several documents to Plaintiff's counsel after the closing that had not been previously provided.

33. Additionally, contrary to Pizarro's representation that discovery had not commenced in the acquired Flame DesignZ lawsuit, discovery requests had in fact been served, including by Pizarro himself. For example, on July 30, 2018, Pizarro sent Plaintiff's counsel a discovery production received by Pizarro on March 7, 2018.

34. Similarly, upon appearing in the case on or around April 8, 2018—after the closing on the APA—Plaintiff's counsel was immediately informed that discovery requests had been served upon Pizarro on or around March 9, 2018—prior to closing—and that the responses were past due.

35. Upon learning of the pending discovery requests, Plaintiff's counsel discovered Pizarro's ostensible failure to advise Sellers of the pending discovery requests, or to even take steps to preserve and collect potentially discoverable evidence. Indeed, following substitution, and contrary to Pizarro's representations that he and Sellers had complied with their legal and ethical duties to preserve discoverable evidence, Plaintiff's counsel discovered that no litigation hold notice had been served, no evidence had been properly preserved, and Sellers were either unaware of the discovery requests served upon them, or they had inexcusably failed to even begin to prepare a response.

36. As a result, Plaintiff incurred significant costs and expenses to prepare responses to the pending discovery requests as best it could, given the late notice and failure to preserve evidence, many of which responses the judge in that case found to be insufficiently specific; the judge ultimately sanctioned Plaintiff and its counsel for discovery deficiencies. This was largely due to Sellers' failure to maintain copies of all documents as they had represented and warranted they would in the APA (§ 6.7) and as required by law. Consequently, Plaintiff was forced to engage forensic consultants to review every device transferred from Sellers to Plaintiff and, in some cases, to circumvent security measures and passwords to extract several gigabytes of data.

37. Additionally, upon substituting into the Acquired Lawsuits, Plaintiff's counsel discovered several irregularities in the manner in which Pizarro had been prosecuting and defending those cases, and that Pizarro had been reprimanded by the court in November 2017,

where the court barred Sellers from further amending their complaint in the Flame DesignZ case because of the three prior unsuccessful amendments filed by Pizzaro, and the January 2018 order where the court criticized Pizarro for filing pleadings "[w]ithout citation of legal authority" and a failure to properly apprehend the clear court rules on consolidation of cases. *See* Exhibit 7, 7/10/18 letter from Edwards to Pizarro at 1-2 and Exhibits 1 and 2 thereto.

38. On June 24, 2018, the court denied another motion because of inexcusable errors by Pizzaro, including failing to confer, lack of organization and legal authority, and failure to meet the applicable burden of proof. In fact, Mr. Pizarro's performance was deemed so unsatisfactory by the Adams County District Court that the judge to the highly unusual step of highlighting the proper procedures Pizarro should have used in its order. *Id.* at 4-5 and Exhibit 3 thereto.

39. In another case, the judge described Pizarro's arguments on Rock's behalf as "underdeveloped" and refused to even consider them. *Id.* at 5 and Exhibit 4 thereto.

40. And on June 30, 2018, Pizarro filed additional pleadings on Sellers' behalves asserting claims of abuse of process, for which Plaintiff's counsel could find no reasonable basis in law and fact. *Id.* at 6. As a result, on July 10, 2018, Plaintiff's counsel dispatched the letter attached hereto as Exhibit 6 to Rock Enterprises out of a genuine concern that Sellers' and Pizarro's conduct was further damaging Plaintiff's position in the Acquired Lawsuits and insisted that Rock substitute counsel, which it eventually did.

41. Additionally, after substituting into the Acquired Lawsuits and in connection with mediation and settlement efforts, Plaintiff's counsel interviewed and met with the predecessor in ownership of Rock, Ray Stone ("Stone"). In the course of this interview and the mediation process, Stone repeatedly contradicted Sellers' and Pizarro's representations and warranties –

11

made orally and in the APA – that Rock had taken appropriate steps to protect the confidentiality of Rock's trade secrets. In fact, Stone stated that there was "no confidentiality whatsoever."

42. Similarly, in August 2018 in discussions about the Flame DesignZ case, Stone expressly contradicted the oral representations and pleadings by Sellers and Pizarro regarding the basis for filing that lawsuit against the lead defendant, Kellie Cameron ("Cameron"), who was alleged to have misappropriated trade secrets and breached her fiduciary duties by competing with Rock while she was still employed by Rock. Specifically, Stone denied that there was ever any basis to suspect Cameron or the other defendants in that case of trade secret misappropriation.

43. As a result of all the foregoing deficiencies and contradictions, Plaintiff was ultimately forced to settle the Acquired Lawsuits instead of pursuing the $1.9 million in damages Sellers had represented the cases were worth.

44. Put simply, Defendants represented the Acquired Lawsuits to be valuable and meritorious, and represented that they had produced all information relating to such Acquired Lawsuits. In reality, Defendants withheld numerous documents and critical information that would have shown that the Acquired Lawsuits had factual problems, were much less valuable than represented, were perhaps liabilities instead of assets, and that Pizarro has prejudicially mismanaged the lawsuits.

**Other Discrepancies**

45. Plaintiff discovered several additional discrepancies following the closing on the APA, including information that seems to have been deliberately withheld to induce Plaintiff into entering the APA, and that at least constitute breaches of Sellers' representations and warranties.

46. For example, contrary to Sellers' representations and warranties that they had not disclosed any confidential information or trade secrets without an express obligation of confidentiality, and contrary to Windemuller's identification of Solus as one of the parties he had accused of willful infringement of Warming Trends' trade secrets, in May 2019 Plaintiff became aware that Windemuller had voluntarily disclosed Warming Trends' confidential and trade secret information to Solus. *See* Exhibit 8, 6/18/19 email exchange between Edwards and Bradley at 1 (attachments excluded).

47. When confronted with this information, none of the Sellers denied it. Instead, Seller's counsel stated that "it was normal operating procedure to send drawings and/or samples to OEM clients" and suggested that the information may have been disclosed in connection with Sellers' attempts to salvage a relationship with Solus. *Id.* at 2. Additionally, Sellers stated that many of these "drawings were also available on the Company's website."

48. None of the foregoing was disclosed to the Flahertys during due diligence or prior to the closing, despite due diligence requests seeking copies of the website and contrary to Sellers' and Pizarro's representations and warranties that such information was maintained as confidential and not publicly disclosed, which is an important requirement for intellectual property protection.

49. Of course, the Flahertys' counsel had specifically inquired about the reasons Solus was disclosed as a potential infringer or violator of Sellers' intellectual property, as reflected in a May 24, 2018 email exchange with Pizarro. *See* Exhibit 9, 5/24-30/2018 email exchange between Edwards and Pizarro.

50. Likewise, in connection with the disclosures regarding potential intellectual property violations by Fairview Fittings, Pizarro was asked to explain the basis for the suspicion

13

and responded by directing Edwards to the burglary police report to support Pizarro's May 10, 2016 cease and desist letter to Fairview Fittings.  Yet, upon further inquiry following the closing, it became readily apparent to Plaintiff that Fairview Fittings' misconduct occurred either with the assistance of Stone, or as a result of the information Windemuller apparently provided to Solus, or both, in each case in breach of the representations and warranties in Section 4.10(a) of the APA.

51. It also is likely that Sellers and Pizarro were aware of these facts as a result of actions between the 2014 burglary and Pizarro's letter, Windemuller's personal involvement with the Solus disclosure, and Sellers' June 18, 2019 response to Plaintiff's questions regarding these issues, wherein they state, "Between Feb 2016 and May 2016, the Company learned that Fairview Fittings was making a knock-off product for Solus," yet Sellers failed to disclose this information to the Flahertys prior to closing.  *See* Exhibit 8.  Sellers did not disclose an executed confidentiality agreement with Sellers in the APA.

52. Additionally, contrary to Sellers' and Pizarro's oral and written representations that all communications regarding the purchased intellectual property had been provided, and that there were no threats to the validity of the purchased intellectual property (APA §4.10(a)) on May 30, 2018, Pizarro produced an email dated March 15, 2018 (prior to closing) from an attorney representing Merkur Holdings, stating that it believes one of Rock's trademark "application[s] is void on its face for fraud." *See* Exhibit 9.  When asked about the delay in providing this information, Pizarro responded that "he forgot about it."

53. Also, contrary to Sellers' representation and warranties and to Pizarro's similar oral representations that all applications for purchased intellectual property were "were properly filed at the time of their filing and are, as of the Closing, properly maintained and in compliance

with the requirements of all applicable law, rules, and regulations governing the same," numerous errors, discrepancies, and misrepresentations have been discovered in connection with the patent application Plaintiff acquired from Sellers. While Plaintiff has been able to remedy these errors via new patent counsel, this has only been accomplished at significant added expense.

**Attempts at Resolution**

54. Plaintiff has tried in good faith to resolve these matters with Defendants, but Defendants have refused to make any meaningful settlement offers and have refused to enter into a tolling agreement to permit further discussions.

**FIRST CAUSE OF ACTION**
**(Defend Trade Secrets Act – Defendant Windemuller)**

55. Plaintiff incorporates by reference all preceding allegations.

56. At least as of the April 2, 2018 closing on the APA, Plaintiff owns and possesses certain confidential information and trade secrets that include, without limitation, the proprietary design and method of manufacture of its patent-pending brass burners and drawings, documents, and other materials reflecting or referring or relating to the same, which trade secrets are valuable and proprietary.

57. These trade secrets are used and intended to be used and sold in interstate commerce.

58. Plaintiff has taken reasonable measures to keep its trade secrets secret and confidential, including, without limitation, the efforts undertaken by Rock prior to closing on the APA and the material contracts as defined therein, which include confidentiality and non-disclosure agreements among authorized parties.

59. The trade secrets derive independent economic value from not being generally known, and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

60. In violation of Plaintiff's rights and prior to the closing date on the APA, Windemuller misappropriated and/or disclosed, without authorization and in violation of his fiduciary and other duties, Plaintiff's trade secrets, with such misappropriation taking place after May 11, 2016, when the Defend Trade Secrets Act became effective.

61. As to any misappropriation taking place prior to the closing date under the APA, Plaintiff acquired the claims of Rock Enterprises by virtue of the terms of the APA.

62. Windemuller's misappropriation was intentional, knowing, and willful.

63. Windermuller's misappropriation has caused damage to Plaintiff.

## SECOND CAUSE OF ACTION
### (Fraudulent Inducement – All Defendants)

64. Plaintiff incorporates by reference all preceding allegations.

65. Defendants, acting in concert, made false and fraudulent representations of past and present material facts as detailed above, including without limitation that they had taken adequate measures to protect the Warming Trends intellectual property, that they had produced all due diligence documents, that the Acquired Litigation was worth nearly $2 million, that such cases had been diligently prosecuted, and that they had disclosed all pertinent information about such cases.

66. Defendants made the representations knowing them to be false.

67. Defendants made the representations with the intent that Plaintiff would rely on the representations by purchasing the assets at a high price.

68. Defendants had a duty to disclose the true facts regarding these representations and chose not to disclose the true facts.

69. Plaintiff justifiably relied on the representations.

70. Plaintiff has suffered damages as a direct result of Defendants' fraudulent misrepresentations.

## THIRD CAUSE OF ACTION
### (Fraudulent Concealment/Fraudulent Nondisclosure – All Defendants)

71. Plaintiff incorporates by reference all preceding allegations.

72. Defendants, acting in concert, concealed and/or failed to disclose to Plaintiff various material facts, including the true status of the intellectual property and Acquired Litigation.

73. Defendants had a duty to disclose these facts to Plaintiff.

74. These facts were material to Plaintiff.

75. Defendants concealed these facts from and/or failed to disclose these facts to Plaintiff to create a false impression of the actual facts and thus to induce them to enter into the APA and to purchase the assets as a high price.

76. This concealment and/or nondisclosure was made with the intent that Plaintiff would take a course of action it would not otherwise have taken, namely, entering into the APA and purchasing the assets at a high price.

77. Plaintiff reasonably and justifiably relied on the nondisclosure and concealment by assuming that Defendants had fairly and honestly represented all material information relating to these issues.

78. If not for the fraudulent concealment and nondisclosure, Plaintiff would not have completed the purchase of the same combination of assets at the same price.

79. This reliance caused Plaintiff damages in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation – Defendant Pizarro)

80. Plaintiff incorporates by reference all preceding allegations.

81. Pizarro gave false information to Plaintiff, including without limitation in indicating that Defendants had taken adequate measures to protect the Warming Trends intellectual property, that they had produced all due diligence documents, that the Acquired Litigation was valuable, that such cases had been diligently prosecuted, and that they had disclosed all pertinent information about such cases.

82. Pizarro gave the false information to Plaintiff in the course of his business and with respect to a transaction in which he and his clients had a financial interest.

83. Pizarro gave the information with the intent or knowing that Plaintiff would act in reliance on that information, namely, that it would purchase certain assets for a high price.

84. The misrepresentations were material.

85. Pizarro should reasonably have known that the information provided to Plaintiff was incorrect.

86. Pizarro had a duty in connection with the transaction to present accurate information about material elements and the status of the transaction and breached this duty.

87. Plaintiff reasonably relied on the information supplied by Pizarro, including specifically the information provided by Pizarro as Rock's agent, and Pizarro knew or should have known Plaintiff was relying upon him for accurate and truthful information.

88. This reliance on the information supplied by Pizarro caused damage to Plaintiff.

## FIFTH CAUSE OF ACTION
### (Breach of Contract – Rock, Windemuller, and Catozzo)

89. Plaintiff incorporates by reference all preceding allegations.

90. The APA constitutes a binding contract.

91. Plaintiff has performed contractual obligations owed to Defendants.

92. Defendants Rock, Windemuller, and Catozzo have each materially breached the contract as outlined above, including breaching the representations and warranties contained in the contract.

93. Defendants' breach of contract has caused Plaintiff to incur damages.

## SIXTH CAUSE OF ACTION
### (Breach of Fiduciary Duty – Windemuller)

94. Plaintiff incorporates by reference all preceding allegations.

95. As an officer and director, Windemuller owed fiduciary duties to Rock Enterprises, including duties of care and loyalty.

96. Windemuller breached his fiduciary duties by misappropriating and disclosing Rock's trade secrets, acting directly contrary to the best interests of Rock and in his own self-interest, by damaging Rock's trade secret protections.

97. Plaintiff acquired Rock's claims against Windemuller for breach of fiduciary duty via the APA.

98. Defendant Windemuller's breaches of his fiduciary duties have caused Plaintiff damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Warming Trends, LLC respectfully demands judgment in its favor and against Defendants Rock Enterprises, Inc., Michael S. Windemuller, Divo Catozzo,

and Ramon L. Pizarro for damages, plus applicable pre- and post-judgment interest, attorney fees and costs, and any other relief allowed by law.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

DATED this 4th day of October, 2019.

EVANS & MCFARLAND, LLC

*The original signature is on file at Evans & McFarland, LLC*

By: /s/ Luke McFarland
  Luke McFarland
  Cyd Hunt
  Evans & McFarland, LLC
  910 13th St., #200
  Golden, CO 80401
  Telephone: 303.279.8300
  Email: lmcfarland@emlawyers.com
      chunt@emlawyers.com

ATTORNEYS FOR PLAINTIFF